here. You hear you. This honorable appellate court for the second district is now open. The Honorable Justice Catherine easy enough presiding along with justices and be Jorgensen and Liam C. Brennan. The case is number 2 17 0606 people of the state of Illinois plaintiff appellee versus Gary Bennett, defendant appellant arguing for the appellant Stephen L. Richards arguing for the appellee Miles Kelleher. Good morning, Council. Mr. Richard, you may begin. Thank you, Your Honor. As you know, I represent Gary Bennett. He was convicted of first degree murder. He was also there's a finding of personal discharge. He was sentenced to the minimum of 20 years for first degree murder to the minimum of 25 years consecutive for personal discharge. And he also received a consecutive sentence of five years for homicidal death for I'm sorry, concealment of a homicidal death. Your Honor, obviously, this was a long and complicated trial and involved a lot of evidence. But I think from our point of view, the issues can be boiled down somewhat. And I'm going to be most mostly addressing unless Your Honor's have other questions. Points one, two and five of my brief point one and particularly the sub point that there was insufficient evidence to prove Gary Bennett guilty of first degree murder based upon the testimony of an accomplice to that the jury should have been instructed as to the law as to that that witnesses who testify in hopes of a reward must be not believed unless there's an absolute conviction of the truth of their testimony. And issue five, the admission of other crimes evidence. Now, in terms of looking through all the evidence, obviously, there's some other issues in terms of whether the victim in this case is actually dead, whether there is proof of death. There's also at trial we raised an issue regarding whether there another person had actually committed the crime. But putting that aside for a moment. Key issue in the case was whether there was proof beyond a reasonable doubt that Gary Bennett personally killed the victim in this case, because the only evidence that he did that, apart from evidence that he may have helped conceal the homicide or done other things was the testimony of Sebastian Vado. Council with respect to that testimony, you argue in your brief that Vados testimony was uncorroborated. But if we look at the evidence in this case, there really was more was there not, we've got the expert testimony regarding the cell phone activity. We have the DNA testing the blood that was found underneath the seat covering in the car that stain. We have the searches on the defendant's cell phone. All of those factors corroborate his testimony. Isn't that right? Your Honor, that's exactly the point I think I was trying to make. And I can think I can sharpen it up here as whether Gary Bennett was present during the shooting or if he had some participation in concealing the death. All of those, all that evidence is corroboration for Vados testimony that Gary Bennett had some involvement of that sort. However, corroboration for Vados testimony that it was Gary Bennett who did the shooting and not Vado is non-existent. None of those pieces of evidence in any way whatsoever corroborates Vados claim that he's driving in the car and all of a sudden Gary Bennett shoots Keith Crawford and that it was not him that was doing the shooting. And that's important because Vado, if Vado is the shooter, obviously he has the strongest motive in the world to say that Gary Bennett is the shooter, doesn't he? Obviously, if he's the shooter, there's not going to be any deal and he's in serious trouble. And if you look at the whole history of Vado's involvement with this case, there is a ton of evidence that what he says simply doesn't make except upon the theory that he is actually the shooter. Why? Number one, well before he met Gary Bennett, he had a relationship with an undercover officer and was giving the undercover officer information. That's number one. Number two, he even after the murder, but before he actually spoke to the police and became a witness, he dropped a dime on Gary Bennett apparently with the idea that the police would arrest Gary Bennett for a drug and finding a gun and that that way Vado would be safe from him. But that as look at Vado's cross examination, that made absolutely no sense. Why? Number one, Vado had no information that the gun could be linked to a body because all he knew and all anybody knew was that Keith Crawford had disappeared. Two, he was aware that people who are charged with guns and drugs often bind out. So of course, Mr. Bennett would still be dangerous. Three, he knew that if he did in fact accuse Gary Bennett of murder at that point, Gary Bennett would not get bonded out. Mr. Richards, if I may. Sure. Everything you're arguing makes sense and it's, you know, in the record, but all of it was heard by the jury and don't we ultimately defer to the jury as it relates to these types of credibility findings? Usually, but not always, is the answer. And the question is, in an accomplice case, the courts have, Illinois courts have often, and I cited all the cases, I think in my brief, there's probably about 20 of them over the years. Illinois courts have reversed and not deferred to juries in cases where the defects in an accomplice testimony were so extreme as to not constitute proof beyond a reasonable doubt. So there's a line here. Obviously, I can't give you any sort of bright line rule or guidance as to where the line is between an affirmance and reversal, except to say, as I said to the jury, but as I'm saying to you, Votto's testimony has extreme problems, very extreme problems in terms of his lying about his motivations, the whole business about the I-90, the lie about I-90, his apparent... How significant was it that he omitted the I-90? I mean, part of the, you know, the drive. That really isn't that significant, is it? He pled guilty to concealment of a homicidal death. So it wasn't as if he, you know, didn't plead guilty to an offense. Well, I think there's two answers to that question. Why don't I take the I-90 thing first, and then I'll go back to the other, your other issue about pleading guilty. As to I-90, all courts, if he had said, originally given a route and then said, listen, guys, I'm sorry, I forgot, I stopped on I-90, that would be one thing. But that's not what happened. What happened was they asked him to redo the route. He redid the route. No I-90. They did it another time. No I-90. They interviewed him multiple times. It was only after the police discovered independently that the car had to have gone on I-90 by checking the cameras, but then they said to him, he said, oh yes, I lied about I-90. And he never had any explanation whatsoever about why he would be lying about that, which is how he characterized it, not as a mistake. I cross-examined him. He said that the route was burned into his brain, that he couldn't have been mistaken. Now, it's one thing to say, okay, I was so out of it, I don't know what route was taken. But multiple times he told the police he didn't know what the route was taken and it wasn't I-90. So I think the reasonable inference is there's something he thought would be discovered around I-90, around that exit, where he himself said the car stopped. That was going to implicate him. Could have been the cell phone, could have been a gun, could have been anything. But that lie rings out. It rings out in terms of his credibility overall. Of course, in addition to the multiple lies and the multiple false statements he made. Now, let me get to the guilty plea, because Your Honor also asked about that. This was basically, he pled guilty to concealment of a homicidal death. He was sentenced to six months in jail, which was actually time considered served. So at the point he pled guilty, he basically got out of jail. He had some sort of expectation he was going to be staying in the United States. I don't know, it's a mystery as to how he got that or what the reality was there. But basically, if he's the actual killer, he's skating on a first degree murder and he's staying in the country, which is what he obviously wants to do to remain with his family, his various mistresses, and so on. The fact that he pled guilty, I think is of no consequence. It's almost close to immunity. At the time he testified, he hadn't been sentenced. So had he backed up on the prosecution, had he said, I'm the actual killer, obviously all deals were off and he's going down. And there's strong evidence that he is, in fact, the actual killer. There's even evidence that was he from Ruben Delano, a state's witness, that it was he who arranged the drug deal, not Gary Bennett. So, excuse me, counsel, where's the evidence specifically that the accomplice here was the two, according to accomplice, Keith Crawford is dead. Three, he had three, he has a motive because there was a drug deal. And Ruben Delano said that after the shooting, it was not Gary Bennett, but Lotto, who came up with the drugs for the for presumably drugs he got from Keith Crawford that he was selling. So the evidence that he's a shooter, I would think would be would be would be strong. It's certainly a lot of evidence that he's not telling the truth about whatever that happened. We don't have to prove he's not telling the truth. That's that's basic one on one credibility issues that the jury decides. And you said you went back to that standard that it must be so extreme, the defects in his testimony. I mean, what is so unusual about this case that would lead us to make that conclusion? I don't want to rehash too much, but the what's so unusual about this case, and you can compare it to some of the other accomplished cases, which I think we're no more, we're actually stronger than this one, not weaker. He has a relationship with an officer and doesn't give any information as to the crime. He tells multiple lies. He, in fact, gets Gary Bennett in trouble, but doesn't doesn't supposedly because he's afraid of Gary Bennett, but doesn't mention the murder at that point. The body is taken and disposed of at his at a dumpster right near his girlfriend's house, not Gary Bennett's house. And he also testifies again, and this goes to the point of pleading guilty or immunity. He admitted that he didn't say anything until the police officers told him specifically, you're not in trouble. You're not going to get in trouble. What trouble? Trouble would be if he big trouble would be if he's the first degree murderer. And we don't have to prove that beyond a reasonable doubt. But given that fact, and given the various weaknesses in his testimony, there is sufficient doubt that the conviction should be reversed in the alternative. At the very least, the jury should have been given an instruction commensurate with Illinois law that his testimony could not be believed unless there was an absolute conviction of its truth. And that was those cases, Mr. Richards, the absolute conviction of truth cases, to the extent that it's still good law. They all involve situations where there is zero corroboration. Here, I realized that you have a certain spin on the corroboration, which I respect, but there is corroboration. It's not the absolute absence of corroboration here. And with that in mind, was it not? I mean, it seems to me the judge was exercising his discretion and just utilizing the IPI as written, not including this additional language. Your Honor, I think you've made several points, and I want to go backwards and start with the first first and go to the other ones. First of all, it's not true that in the it's not true that in the accomplished cases where they're reversed, there is in all those cases, there's no corroboration, not not where they're reversed, but where this instruction potentially should be given. I don't think I would I would have to look at the cases myself, and I have to be honest in that I haven't looked at them from that particular angle, because that was not an argument made by the state. But number one, in terms of the absolute conviction of its truth language, some of those cases do not involve accomplices. And some of them, they just involve witnesses who, although not accomplices are given, you know, are given great benefits or testify in hope of reward. So there's a most of the cases are both accomplished cases and reward cases. But there's a minority on either end. There's a one going each one way. So, Your Honor, I wouldn't agree with you that in all those cases, there's no corroboration. I just don't think that's legally legally true. And if you look at the cases, I don't think you would find that your next point was that it's within the judge's discretion to follow the IP and not give this second instruction or second part of the instruction. And that point, Your Honor, I think that there's very little case law on this. The last time this district or any district looked at the issue of the instruction was in 1988. And I'm just going to advise you your time is up. Just go ahead and finish your thought on this point, please. Yes. And the last point I would say is, is Justice Brennan, the principle of absolute conviction of its truth was reaffirmed by this court in 2007. And by the first district in the often case in 2019. So it's an established principle, it should have been given to the jury. And I thank you. And I'll talk about other things on my rebuttal. All right. Thank you very much, Mr. Keller. May please the court. Good morning, Your Honors Council. Miles Keller here on behalf of the people. Defendant was proved guilty of first degree murder beyond a reasonable doubt. Now, defense counsel speculates, well, maybe Vado committed the murder. Well, it sounds like he's trying to resurrect the old reasonable hypothesis of innocent standard. And as this court knows, that's not the standard of review here. This court has to view the evidence in the most favorable to the prosecution. And the question is whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. And that's what happened here. Now, all the facts about Vado that counsel discussed were before the jury. The jury was aware of Vado's agreement with the Kane County State's Attorney's Office. The jury was aware of Vado's immigration status. That was all in front of the jury. And it was up to the jury to determine Vado's credibility, resolve any conflicts in the evidence, including the I-90 question, which he described as inadvertent. And also- Mr. Keller, if I may just interrupt. Regarding Vado's credibility, can I ask you specifically about the prior bad acts evidence utilized to explain Vado's fear and why he didn't come forward? I have two questions related to that. The first is, as it relates to the April 2011 shooting in the alley, that doesn't seem to tie up in terms of the facts as it relates to what Vado said. Vado says, I'm scared of Bennett because he told me in 2011, he shot somebody in good time. Somebody goes into Leeds, finds a 2011 arrest. They don't even seem to tie up. So, that's my first question. My second question related to that is, how is this not bolstering? Your Honor, the trial court specifically put limits on the other crimes evidence. The trial court specifically stated to the jury, this evidence has been received on the issue of the reasons for Vado's alleged fear of defendant and may be considered only for that limited purpose. Why is that relevant? Because Vado, first of all, Vado had only lived with defendant for about a month or two. So, he didn't know defendant that well, but he did know that defendant carried a gun and he had heard these prior incidents from Vado, from defendant. The trial court found that under the unique situation, the facts of this case, where you have an accomplice witness who is in the car when the shooting occurs and then chooses to remain with the defendant for several hours until the body is disposed, this is a unique fact pattern. The trial court, in its discretion, believed that this prior evidence was helpful for the jury to understand why Vado did what he did. Is that nothing other than bolstering Vado's credibility? No, Vado's already saying, I'm in the car, while I'm in the car after the shooting, he says, if you talk about this, your wife and kid could be in danger. So, obviously, that plus, I just saw him shoot somebody, probably would be enough to explain to the jury why it is Vado was reluctant or delayed in coming forward. All this other stuff, I'm having a hard time viewing it as anything other than bolstering Vado's credibility. Well, your honor, there was, the trial court determined that, you know, all other crimes evidence has some potential prejudicial value, but in this, under these facts, the trial court determined that the probative value of this evidence wasn't outweighed by the prejudicial effect because the trial court believed that the jury, it was beneficial for them to understand why Vado feared defendant and why he remained with defendant after the shooting. The trial court never told the jury that they could use this evidence to bolster Vado's credibility. The trial court specifically placed strict limits on how this evidence could be received by the jury. And that was, it could only be considered for limited purpose as to the reasons why Vado feared defendant. It was not there for, you know, it could not be used to bolster Vado's credibility. And I would just point out that the trial court has a lot of wide discretion in this area and each case has to be decided on its unique facts. What might be prejudicial in one case may not be prejudicial in another case. And I submit that in this case, the trial court properly exercised its discretion when it allowed these prior incidents of other crimes in. And I would also- The question is how much is too much? How much of all these other bad acts becomes overkill? I think that was really what Justice Brennan's question was driving at. Look, you've got his guy, put a bullet through the guy sitting next to me. What more do you need to show you're afraid of someone? Your Honor, it has to be decided on a case-by-case basis. And in this case, I submit that if any error did occur, it was harmless under the facts of this case, beyond a reasonable doubt. And that's because these two incidents, when you consider this case as a whole, they really were not a material factor such that without this evidence, the verdict would have likely been different. There's no reasonable probability- Without Vado's testimony, the state doesn't have much of a case. So anything that bolsters or enhances his credibility is significant. Yes, but Your Honor, here there was an abundance of other evidence corroborating Vado's testimony. So even if these other crimes weren't admitted, you had a large amount of scientific evidence that was consistent with Vado's testimony and corroborated Vado's testimony. First of all, you had the blood stain under the front passenger seat. The DNA test revealed that the victim was the source of that blood. You have the analysis of cell tower records. Those records indicated that in the early morning hours of August 10th, defendant's phone was first in the area of his house in Algonquin. Then it went to the area of Jimmy's house in West Dundee. Then it went down to the area of Quagliona's house in St. Charles. And you also had Vado's phone traveling in the same direction from Jimmy's house down to St. Charles where Quagliano lived. And you also had the victim's phone, which was present at the party at the same time. And then it's consistent with his phone traveling south on 31. And then it abruptly stopped sending outgoing messages, outgoing phone calls. Then you have other evidence. When defendant gets to Colorado, he sends a series of threatening messages and phone calls to name. And they refer to the victim as the package, the body. And then you have defendant making these internet searches. The victim, Keith Crawford, root garbage dump, where are dumpsters emptied, disassemble a nine millimeter Ruger. Now, why is defendant making these internet searches? Because he's worried. He's worried about what's happening to the victim. Where was his body taken when the group garbage company emptied the dumpster? Was it taken to a landfill? He doesn't want the police to find the body. And this all corroborates Vado's testimony that Vado, everything, all this scientific evidence is consistent with what Vado said. And it's also consciousness of the defendant's guilt. So going back to the question about the other crimes evidence, this all demonstrates that this was not, those isolated incidents were not a material factor and were not introduced to bolster Vado's testimony because you had all this other credible evidence, scientific evidence that was entirely consistent with Vado's testimony and corroborated everything he said. And again, as this court already mentioned, it was up to the jury to determine Vado's credibility. It was up to the jury to resolve any conflicts in the evidence, to draw reasonable inferences, to decide how much weight to be given to his testimony. And Vado testified, he was in the car. He heard the gunshot. He saw defendant with the gun. He saw the victim bleeding. He was then, defendant puts the gun on Vado and says, drive safely. And if you don't drive safe, I'm coming after your kids. I'm coming after your family. And Vado's scared. So there's an abundance of evidence as to why Vado was scared in this case. So I have a question about one of the jury instructions here. Wasn't the standard IPI instruction lacking when it didn't tell the jury that it had to was dead? And isn't that really like the Ellard case that opposing counsel used? The Ellard case where the first district said that the prosecution had to prove that this baby was alive first. Your Honor, the Ellard case was, factually, it was a completely different situation because you had a newborn infant that was killed. And there was some question as to whether that baby had been born alive or dead at the time. So this is entirely different here. Here, the jury received IPI 7.04, which required the people to prove beyond a reasonable doubt that defendant performed the acts which caused the death of Keith Crawford. Now, the jury could not have found that defendant had performed the acts which caused Crawford's death unless they first determined that Crawford was actually dead. And the jury, in this case, made a specific finding that defendant had personally discharged the firearm, which approximately caused the victim's death. Now, I know defense counsel wanted to speculate. Pardon? I'm sorry. Counsel, somehow your audio tuned out for a second. Could you repeat that? The jury made a specific finding that the defendant had personally discharged the firearm, which approximately caused the victim's death. So the jury resolved the question of whether the victim was alive or dead. Again, that was a question of fact for the jury to determine. And there is ample evidence that the victim was dead here because not only did you have the Vado's own testimony, but you also had, you know, a number of witnesses who testified that they never saw the victim again, never heard from him. This was, you know, Regina Miles, defendant's mother, Shanika Lewis, the mother of two of the victim's children, Barbara Latek, another mother of the victim's children, George Lambropoulos, Darius Holmes, Darius Garcia. They all testified they never saw the victim again, never heard from him. And then you also have the victim's phone at 2 19 a.m. on the early morning of this offense. Suddenly no outgoing calls, no text messages. And this is a victim who had used his phone quite a bit. There is evidence of that in the days preceding. Suddenly nothing again. So the jury resolved that question. They determined that the victim was dead and that defendant was the person who killed him. So going back to the question about the jury instructions, the instructions that were provided adequately fully and accurately stated the relevant law. And it's just, you know, common sense to think that the jury could have reached a conclusion they did if they somehow believed that the victim was still alive. Clearly that wasn't the case. This was a rational jury and there's no indication to believe otherwise. And again, the jury instruction that was given was a proper exercise of the trial court's discretion. And I would also just point out that as to the non-pattern jury instruction that defendant wanted on the accomplished witness testimony. Excuse me, your time is up, but go ahead and just make that last point, please. Yes, Your Honor. There was no evidence that defendant was testifying in hope of a reward and this court's opinion in King is right on indicating that IPI 3.17 adequately informed the juries as to its duty regarding accomplished witnesses. Thank you, Justice Brennan. Justice Jorgensen, do you have any other questions of Mr. Kelleher? Nor do I, thank you. Thank you, Mr. Kelleher. Yes, for all these reasons, as well as those in our brief, the people request that this honorable court affirm defendant's convictions. Thank you. Thank you, Mr. Richards. Yes, Your Honors. Let me just deal with some issues that came up in your honors questioning of Appley. First of all, as we say in our brief, and we're not waiving this for the purpose of bolstering or supporting the credibility of Votto and for no other good reason. As Your Honor is aware, it is abuse of discretion standard. However, our position would be on that, that the trial court made an error of law when he admitted this for an improper purpose, bolstering. Our reason to be fearful is basically bolstering or supporting credibility. So I think, as I think we said in our brief, the de novo standard would apply even under an abuse of discretion standard. As Your Honors are aware, what the trial judge is supposed to do is balance the prejudicial effect of the evidence against the need for it. In this case, as Your Honors pointed out, where Votto was saying that Gary Bennett shot somebody in front of him and then threatened him multiple times over the course, there was no reason and no purpose to say that we needed to know about what Votto thought about other incidents involving Gary Bennett. Plus, which this was very harmful because as we have said, Votto's principal reason for not coming forward that he gave again and again and again was that he was afraid of Gary Bennett. Um, this was an attack on Gary Bennett's credit character, which was utterly unwarranted. The second point I would make as to the Ellard instruction. The point is, you could have said the same thing in Ellard about that instruction, you could have said, listen, if the if the jury finds that the defendant caused the death, then obviously they must have believed that somebody who's dead was born alive. But the court said that in that instance, in a situation where there's a question whether there's born alive or not, the jury has to be focused in on that issue. And in addition, the fact that the jury ultimately found that Bennett approximately caused the death, that was a finding which occurred after they had already made the decision as to guilt. And the instruction they were given assumed death. It didn't specifically direct them to prove beyond a reasonable doubt. The last point I'd like to make, Your Honor, is I and I thought about this today and over the preceding days, I would like to direct Your Honors to a case which does not support my position, but was not pointed out in Appley's brief, which I was the attorney on. It did not come out until after I filed my brief. But the case is the case of people versus James Jones from the fourth district. So I think in the interest of candor, I have an obligation to make the court aware of that case. And I will send a letter with the site as well. Because that is one case that rejects previous law as to accomplices. Thank you, counsel. Do you happen to have the site at this time or not? If you give me two seconds to Well, don't don't use up your time at this point. If you send the letter promptly, I'm sure that will be sufficient or we'll be able to find it with the information you gave us. Thank you. Go ahead. No, I have I don't. I mean, I've used my five minutes, but I had don't think I have anything further to add. I would just say this. Also, in terms of the arguments I made with respect to reasonable doubt. Obviously, that goes to the question of whether the other errors were harmless, particularly the error as to other crimes evidence and as to the accomplice instruction. This was a closely balanced case. As your honors have acknowledged, Votto's credibility was something to behold in terms of the whole picture. And therefore, no errors were harmless. And if the case is not reversed outright, it should be reversed and remanded in our view. Thank you. Thank you. All right. Justice Jorgensen or Justice Brennan, any further questions? I have no additional questions. Thank you. Justice Brennan. I have none either. Thank you. Okay. No, thank you counsel for your arguments today. The court will take the matter under advisement and render a decision in due course. The proceedings have ended in this case at this time. Mr. Kaplan, will you stop the recording, please?